SABINO BILOTTI, PLAINTIFF-APPELLANT, v. ACCURATE FORMING CORPORATION, A CORPORATION OF THE STATE OF NEW JERSEY, EVERLAST METAL FINISHING CORPORATION, A CORPORATION OF THE STATE OF NEW JERSEY, JANILEEN REALTY COMPANY, A CORPORATION OF THE STATE OF NEW JERSEY, PATRICK MALONEY, MORRIS BUSACCO, EDWARD CAVALLERI, AND ANDREW SERIN, JOINTLY, SEVERALLY, OR IN THE ALTERNATIVE, DEFENDANTS-RESPONDENTS.

Argued October 23, 1962—Decided January 21, 1963.

*Mr. Robert E. Pollan* argued the cause for plaintiff-appellant (*Messrs. Hammer and Hammer,* attorneys; *Mr. David H. Hammer* on the brief).

Mr. *Emanuel A. Honig* argued the cause for the individual defendants-respondents except defendant-respondent Serin.

Mr. *Max L. Rosenstein* argued the cause for the corporate defendants-respondents (*Messrs. Rosenstein* and *Margolis,* attorneys; *Mr. Rosenstein,* of counsel).

No appearance was made or brief filed on behalf of defendant-respondent Serin.

The opinion of the court was delivered by

HALL, J. This case is here on plaintiff's appeal from summary judgment granted defendants in the Law Division. We certified the matter on our own motion before argument in the Appellate Division. *R. R.* 1:10–1(a).

The essence of the cause of action is a claim of fraud in connection with the sale of plaintiff's stock in the three corporate defendants resulting in the receipt of an inadequate price. Of principal concern is the effect of a general release given by plaintiff when the sale was consummated. .

The summary judgment application was heard before pretrial conference and before discovery had been completed. In fact, the motion was made while plaintiff's deposition was still being taken by defendants and before he had had any opportunity for discovery on his part. We can, therefore, consider the case only as it had been unfolded to that point, and, as in all summary judgment matters, we must regard the situation most strongly against defendants in the light of their burden to "show palpably that there is no genuine issue as to any material fact challenged" and that they are entitled to judgment "as a matter of law." *R. R.* 4:58–3. *Judson v. Peoples Bank & Trust Company of Westfield,* 17 *N. J.* 67, 73–77 (1954) (*Judson* I). So viewed, the following appears.

Plaintiff and the individual defendants were the sole stockholders of these three small corporations, each holding four shares. The five constituted the board of directors and were

the officers of each company. Two of the corporations were engaged in manufacturing and the third was a realty holding company. Their affairs seem to have been managed as a unit and they may be treated as one for present purposes.

In November 1958, after two or three years operation of the businesses, during which plaintiff had been engaged in production work rather than financial management, he was discharged from employment by his four colleagues and was thereafter excluded from participation in the enterprise as an employee, officer and director. He retained counsel and there were negotiations for the sale of his stock interest. It does not appear whether he or his former associates first proposed the idea of a sale.[1] He and his then attorney were furnished some figures, said to have come from the corporations' books, which indicated a total net worth of $125,000, thereby giving his one-fifth interest a book value of $25,000. The negotiations did not result in a sale. It is inferable that plaintiff was insisting on a book value price which defendants were unwilling to meet. In November 1959 he received notice of stockholders' meetings of the manufacturing companies which were called to act on proposals to issue additional stock and to authorize the granting of stock options to the other four shareholders. The meetings resulted, over plaintiff's protest, in authorization for such options to the extent of 250 shares to each of the four, to be exercised within a five-year period at a price of $2 per share.

About December 1, 1959, plaintiff instituted a suit in the Chancery Division against the present defendants. The complaint was not before the trial court but has been furnished us pursuant to request at oral argument. The first count sought to set aside the stock option action as illegal and to enjoin its consummation. *Cf. Eliasberg v. Standard Oil Company,* 23 *N. J. Super.* 431 (*Ch. Div.* 1952), affirmed o. b. 12 *N. J.* 467 (1953). The second count claimed for some $6500 said to be

---

[1] The complaint speaks of prior agreements between the individuals relating to the retirement and control of stock, but the motion proofs and arguments made no further reference thereto.

owed plaintiff by the manufacturing companies. The third simply alleged his naked belief that the affairs of the corporations were being mismanaged and corporate property diverted for the benefit of the other stockholders to his detriment. The relief sought was examination of the corporate books, records and other financial information. The count partook of a stockholder's bill for discovery or action in *mandamus* under the old practice, see *Fuller v. Alexander Hollander & Company*, 61 *N. J. Eq.* 648 (*E. & A.* 1900), and *Lippmann v. Hydro-Space Technology, Inc.*, 77 *N. J. Super.* 497 (*App. Div.* 1962), seeking information upon which to base a derivative suit against corporate officers and directors.

The suit apparently reactivated negotiations for the purchase of his stock interest. There is nothing in the present record to indicate that the discussion revolved around mere settlement of the claims asserted in the complaint. A few months later, according to plaintiff's deposition testimony, his attorney reported inability to obtain satisfactory current financial information about the corporations, and an offer to purchase his stock for $25,000. The plaintiff thereupon, so he says, telephoned the defendant Busacco, who was his brother-in-law as well as the directing head of the businesses and who acted for the other defendants, and inquired whether the $25,000 offer represented one-fifth of the then corporate net worth. Busacco told him, he asserts, that it did and that there had been no substantial changes in the figures which had been furnished several months previously. He relied upon these representations and agreed to accept $25,000 for his stock plus $3500 to be paid to his counsel for fees.

The transaction was consummated near the end of April 1960. Plaintiff resigned as an officer and director of the corporations. He delivered his stock and received a check of one of the corporations for the sale price. The record does not disclose the transferees but presumably they were the respective corporations or some or all of the individuals. At least, all received the benefit of the removal from the scene of

this one minority stockholder. The back of the check contained the notation that it was for "purchase and satisfaction of stock * * * including satisfaction in full of all claims for bonuses, salaries, loans, and any claim or demand of any kind or character." Plaintiff also delivered a general release under seal running to the corporations and the individuals. It was in the customary printed form, discharging all claims against defendants which plaintiff "ever had, now has or which he * * * hereafter, can, shall, or may have, for, upon or by reason of any matter, cause or thing whatsoever, from the beginning of the world to the day of the date of these Presents." The only added special language has no pertinency. (The purpose of a second release to the same effect, dated May 27, 1960, is not apparent.) In addition, the then pending suit was dismissed with prejudice by stipulation of counsel. See R. R. 4:42–1(a).

Several months later plaintiff learned from the defendant Serin, who in the meantime had sold his identical interest for a much larger sum than plaintiff received, that Busacco had misrepresented the corporate worth and had withheld the true situation in the telephone conversation. The information was that the corporate assets were actually far greater because cash and property had been secreted or diverted and did not appear on the corporate books. It may also be inferred that plaintiff was told that the books themselves would have disclosed a greater worth than Busacco had represented.

The present suit followed. The complaint in its omnibus general charges and inconsistent demands for relief is perhaps indicative of doubt as to the precise theory of the cause of action sought to be asserted, in view of the delivery of the release, and the exact mechanics necessary or available to bring success. In many respects it bears but little resemblance to the factual picture painted by the motion proofs and lacks that particularity of the wrong required by R. R. 4:9–1. There is no specific mention of the sale of the stock until the prayers are reached, although that transaction is the fulcrum of the case. The rambling document is instead keyed

to the "settlement" of the undescribed prior litigation for $28,500, alleging that, by reason of knowingly fraudulent misrepresentations of the financial status of the corporations and concealment of the true situation when there was an affirmative duty to disclose, plaintiff, relying thereon, was induced to enter into the settlement and deliver the release, although his share of the corporate net worth was actually at least $20,000 more. All defendants are sought to be charged on the theory of agency except Serin, who is specifically absolved though named as a party.

The initial demand of the complaint is for money damages in the amount of $50,000. *Cf. R. R.* 4:8–1. The prayers go on in effect to request rescission—the setting aside of the release and settlement and the return of plaintiff's stock, without any tender on his part of the moneys previously received —and an accounting and judgment for his actual one-fifth interest in the corporate worth. There is no demand to be relieved from the dismissal of the prior litigation, see *R. R.* 4:62–2, or to pursue that cause further.

After the filing of answers denying all elements of plaintiff's cause of action and pleading the release as a bar[2], plaintiff served interrogatories on all defendants except Serin, which were never answered. Shortly thereafter both sides served notices to take the depositions of the opposing parties and for the production of books and records. The date and place specified were identical and the trial court ordered that plaintiff's deposition be completed first. His examination consumed two days and went far afield. It was finally suspended by defendants' counsel after plaintiff, on the advice of his attorney, refused to produce some personal notes and to answer two questions. Defense counsel stated that the

---

[2] All defendants except Serin counterclaimed against plaintiff for punitive damages on a claim of malicious abuse of process which apparently remained open after the grant of summary judgment on the complaint. Crossclaims for contribution were also filed against Serin by the other defendants.

suspension was for the purpose of permitting an application for an order compelling production and answer.

. Instead of applying for such an order, defendants moved for summary judgment, relying upon the deposition of plaintiff together with affidavits of Busacco which set up the release and denied misrepresentations and fraud of any kind. A notice of motion to compel production and answer by plaintiff was later served. This apparently was a defensive measure, to be pursued only if summary judgment was denied.

Plaintiff countered with a motion to stay the application for summary judgment until the depositions of defendants were taken, the corporate books and records examined and the testimony of the corporations' accountant obtained, orders for which were sought. A direction to answer plaintiff's interrogatories was also requested. It was asserted that his cause of action would thereby be factually established.

The application for summary judgment was heard first. The trial court held that the release barred the suit since plaintiff concededly claimed fraud in its inducement rather than in its execution. Reliance was placed on *Kearney v. National Grain Yeast Corporation,* 126 *N. J. L.* 307 (*E. & A.* 1941), in which it was held, under the pre-1948 practice, that only fraud in the execution of a release could avoid its effect in an action at law. Because of this conclusion the other motions were dismissed as moot. We think the result was wrong.

Since this suit is in an early stage and still not fully developed, we ought to review a judgment terminating it now from the standpoint of whether there is any basis upon which plaintiff should be entitled to proceed further. We should also say, however, that the mere existence of issues of fact does not preclude summary judgment unless a view of those facts most favorable to plaintiff adequately grounds some claim for relief.

The five elements of a classic case of legal fraud in the transaction may be spelled out of the complaint as that plead-

ing is made meaningful by plaintiff's deposition. *Anderson v. Modica,* 4 *N. J.* 383 (1950) ; *cf. Judson v. Peoples Bank and Trust Co.,* 25 *N. J.* 17 (1957) *(Judson II).*[3] The absence of scienter not being suggested, this basic cause of action goes beyond fraud cognizable only in equity. *Cf. Hernig v. Harris,* 117 *N. J. Eq.* 146 *(Ch.* 1934) ; 5 *Williston, Contracts* § 1500 *(rev. ed.* 1937).

As seems apparent from the fact that the suit was commenced in the Law Division, see *R. R.* 4:41–2, and as was confirmed by counsel at oral argument, the primary right claimed is legal. What plaintiff really wants, despite the ambiguities of the complaint, is money damages for deceit, measured by the difference between the true book value of the stock and the amount received. We are assured that he is not actually interested in having his stock back and resuming the unenviable position of a minority stockholder, without power in the situation present to compel the active parties in the corporations to purchase his interest at any price. It is plain from his complaint that he is certainly not desirous of proceeding anew with the prior litigation, which had nothing to do with sale of his stock except as a nuisance lever, and success in which would produce no immediate personal financial return other than upon the count for money owed. The inconsistent, and supplementary or alternative, demands for equitable relief by way of setting aside the release, rescission of the transaction and the like reflect only concern and uncertainty as to the effect of the release, *i. e.,* that it might stand in the way of the primary claim for money damages,

---

[3] There is no specific allegation of the requisite that the affirmative misrepresentations or concealment in violation of a duty to disclose were undertaken for the purpose of defrauding and with the intent that plaintiff rely thereon, *Gherardi v. Board of Education of City of Trenton,* 53 *N. J. Super.* 349, 366 *(App. Div.* 1958), but it may be inferred. However, *amendment of the complaint in this regard is indicated,* as well as perhaps in other particulars as will later appear, after discovery has been completed and the case shaken down and approaching pretrial conference.

or perhaps that the legal claim might be found deficient somewhere along the line.

We look at the matter first from the thesis of the trial court's decision, which proceeds on the supposition, seemingly shared by counsel below, that plaintiff must avoid the release. The case was thereby likened to an action where a release was given on a prior settlement of the cause now sued upon, that instrument is pleaded by way of defense, and fraud in the inducement is set up in the reply to avoid its otherwise barring effect. The court held that there was no cause of action simply because the legal fraud complained of related to the consideration for the release rather than to its purport and execution. It may be observed preliminarily that, since the alleged fraud is concededly only of the former character, the summary judgment does properly remove from the case any possible issue of fraud in the execution, even though it is otherwise erroneous. See *R. R.* 4:58-4.

The common law rule the trial judge utilized—that fraud in the consideration for a release may not be availed of in a court of law to avoid the effect of a release as a bar to a legal action—is a long established principle, which was of significance in the pre-1948 court system providing for tight compartmental administration of law and equity. This court has not had occasion to re-examine the rule or its application since the adoption of the Constitution of 1947, providing that "* * * the Law Division and the Chancery Division [of the Superior Court] shall each exercise the powers and functions of the other division when the ends of justice so require, and legal and equitable relief shall be granted in any cause so that all matters in controversy between the parties may be completely determined." *Art.* VI, § III, *par.* 4.

The basis for the rule at common law was spelled out in the case which settled it in this State, *Stryker v. Vanderbilt,* 25 *N. J. L.* 482 (*Sup. Ct.* 1856). As Chief Justice Green there put it:

"The question is not whether a court of common law has jurisdiction over questions of fraud, or power to relieve against it. That is

conceded. The difficulty grows out of the familiar principle, that a seal imports a consideration; and where the contract is in itself legal, the amount or value of the consideration cannot be inquired into in a court of law: and inasmuch as an averment of fraud in the consideration of the contract necessarily involves an inquiry into the consideration upon which the deed is founded, that defence cannot be set up without a violation of well settled principle.

'In contracts under seal,' says Chancellor Kent, 'a consideration is necessarily implied in the solemnity of the instrument, and fraud in relation to the consideration is held to be no defence at law, though fraud in relation to the execution of the specialty, and going to render it void, is a good defence.' 2 *Kent's Com.* 464." (25 *N. J. L.,* at *p.* 492).

A strong dissent by Justice Elmer questioned the fundamental soundness of the rule and urged, in effect, that the majority was indulging in unrealistic technicalities and hairsplitting:

"Fraud in the consideration strikes at the contract itself, and shows that in truth the instrument, however solemnly sealed, never had any legal entity, just as truly as illegality, unless we are bound to hold fraud to be legal.

\* \* \* \* \* \* \* \*

\* \* \* I am clear that the true doctrine of the common law is, that whenever fraudulent misrepresentations have induced a party to execute a specialty with due formality, and are of such a nature that in justice they render the contract absolutely void, which it belongs to the court to decide when they are presented, and no equities have arisen on the other side, the fraud may be set up at law. A person who is fraudulently entrapped into the execution of a specialty, no matter at what stage of the proceeding the fraud was committed, is no more a free agent, and ought to be no more bound by his deed than one who has been constrained by duress. The deed is in neither case his deed. Such a fraud can be dealt with as well in a court of law as in a court of equity. That species of fraud which, under some circumstances, is a matter of inference, growing out of peculiar relations and duties, is different; for the most part, it can only be remedied in a court of equity." (25 *N. J. L.,* at *pp.* 499, 501–502).

but the Chief Justice did significantly say:

"No great principle is involved in the question. The controversy relates merely to the tribunal in which the party defrauded shall have relief. The principle, that fraud vitiates a contract, is admitted.,

But in attempting to administer relief in a court of law, another well settled principle is encountered, *viz.* that a seal imports a consideration, which cannot be gainsaid at law. The only inquiry is, whether the latter principle shall be abandoned, or the party complaining be required to go into equity for relief." (25 *N. J. L.*, at *p.* 494).

The doctrine's full sweep was substantially curtailed by statute in 1871 and 1875 (*Rev.* 1877, *p.* 380, § 16, *p.* 387, § 52), carried forward into *N. J. S.* 2A:82-3 and now reading as follows:

"In any claim upon a sealed instrument, a party may plead and set up, in defense thereto, fraud in the consideration of the contract upon which recovery is sought, or want or failure of consideration, as if the instrument were not sealed. In such cases the seal shall be only presumptive evidence of sufficient consideration, which presumption may be rebutted as if the instrument were not sealed."

The statute was held, however, not to apply to a release asserted as a bar to a cause of action, since it was not an instrument upon which a claim was being made. *Braden v. Ward,* 42 *N. J. L.* 518, 523 (*Sup. Ct.* 1880); *Waln v. Waln,* 53 *N. J. L.* 429 (*E. & A.* 1891), *id.* 58 *N. J. L.* 640 (*E. & A.* 1896). So the effect was that, in all instances except those involving a release, a claim of fraud in the consideration for the transaction cognizable at law was remediable there. It is somewhat difficult to understand, as a matter of hindsight at this late date, why the Legislature did not include the release situation as well.

Under the old judicial system, therefore, a plaintiff, confronted with a sealed release affecting the cause of action he was asserting in the law court, had to institute a separate action in the Court of Chancery to seek to set the instrument aside whenever the fraud which was claimed to avoid it related to the inducement—not because he did not have a case of legal fraud, but by reason of the fact that only equity could furnish the remedy. See *Spangler v. Kartzmark,* 121 *N. J. Eq.* 64 (*Ch.* 1936); *Savage v. Edgar,* 86 *N. J. Eq.* 205 (*E. & A.* 1916); *McGrail v. Jersey Central Traction Co.,*

84 *N. J. Eq.* 261 (*Ch.* 1915); *Connor v. Dundee Chemical Works,* 50 *N. J. L.* 257 (*Sup. Ct.* 1888); *Dundee Chemical Works v. Connor,* 46 *N. J. Eq.* 576 (*E. & A.* 1890). When, however, the claim was one of fraud arising out of representations going only to the nature or effect of the releasing instrument, the issue was determinable in the law court on the theory that such a defect went to the very legal existence or validity of the document. See *Peter W. Kero, Inc. v. Terminal Construction Corporation,* 6 *N. J.* 361, 368–370 (1951). This distinction led to a line of cases, listed in *Kero,* in which the law courts, particularly in personal injury actions where the circumstances indicated the plaintiff had been overreached by the defendant in negotiating a settlement, were quick to find fraud in the execution of the release and thereby make it unnecessary for a party who had been so imposed upon to go to the expense and trouble of commencing a separate equity proceeding in order to clear his suit at law on the original cause of action.

*Kearney v. National Grain Yeast Corporation, supra* (126 *N. J. L.* 307), relied upon by the trial court, involved a situation factually similar to that at bar, except that the cause of action asserted in the second suit unquestionably had been the subject of the prior litigation and the release given on the settlement thereof, which was claimed to have been fraudulently induced. The court's dismissal of the suit on motion cannot be construed to mean that the plaintiff did not have any right of action because the fraud was in the consideration, but rather that he could not pursue his claim at law until he had set the release aside in equity.

One of the great purposes of the procedural reforms of 1948 was to do away forever with this shuttling from court to court with its inexcusable confusion and waste of judicial effort and the unnecessary expenditure of litigants' time and money. *Steiner v. Stein,* 2 *N. J.* 367, 377 (1949). It is, consequently, error today to dismiss an action at law, as the trial court did here, simply because a release said to bar the action was obtained by fraud remediable only in

equity. *Cf. Heuter v. Coastal Air Lines, Inc.*, 12 *N. J. Super.* 490 (*App. Div.* 1951).

The individual defendants suggest, however, that even though the trial judge was wrong in his basis of decision, dismissal of the suit should be sustained because the complaint does not allege nor does plaintiff's deposition establish that the release could be set aside even in equity. The point made is that before equity will give relief, it must be shown not only that intentional misrepresentations were made with respect to the consideration for the instrument, but also that the releasing party was illiterate, weak-minded, distressed, or imposed upon by artifice, undue pressure or importunity, without advice or time for deliberation. They cite *Heuter v. Coastal Air Lines, Inc., supra* (12 *N. J. Super.* 490) ; *Scott v. Bodnar,* 52 *N. J. Super.* 439 (*App. Div.* 1958), certif. denied 29 *N. J.* 136 (1959) ; and *Dundee Chemical Works v. Connor, supra* (46 *N. J. Eq.* 576). See also *McGrail v. Jersey Central Traction Co., supra* (84 *N. J. Eq.* 261). The notion is a mistaken one. In the cases relied upon, there were no affirmative misrepresentations or fraud in the sense claimed here, but rather only unconscionable conduct in all the circumstances which made it inequitable to bind the releasing party. Actual fraudulent misrepresentations are enough without more.

Another view of plaintiff's cause of action, apparently that which he intends and deducible from the complaint in the light of the facts shown in the deposition, although not clearly articulated therein or in the argument before the trial court, will also sustain the suit against dismissal at this stage. We refer to the alternative legal remedy generally held to be available to a defrauded party by election, whereby he may affirm the transaction and sue at law to recover the damages sustained as a result of the fraud. Professor Williston describes this remedy in the following language :

"Although relief may be obtained by a defrauded party to a contract in a variety of ways, such relief is always based on one of three general remedies which are open to the defrauded party: (1) A

right to damages for being led into the transaction. Under this form of relief the injured party does not seek to undo the fraudulent transaction but claims sufficient compensation to make his position as good as it would have been had he not entered into the transaction at all.

\* \* \* \* \* , \* \* \*

\* \* \* no restoration of any consideration received is necessary nor may the plaintiff recover the value of his performance—he is restricted to the difference between the value of what he received and the value of what he gave—an *ex delicto* recovery." (5 *Williston, Contracts,* § 1523, *pp.* 4264, 4265 (*rev. ed.* 1937).

This theory, when applied in a case where a release had been given in connection with a transaction, makes avoidance of that instrument unnecessary. On this thesis, it is of no importance in the instant case whether the "settlement" or the stock sale is the fraudulently induced transaction or what claims the release purported to discharge.

An illustrative case in a release situation, practically on all fours with that at bar, is *Goldsmith v. National Container Corporation,* 287 *N. Y.* 438, 40 *N. E. 2d* 242 (*Ct. App.* 1942). There the plaintiff, a stockholder, director, president and general manager of a closely held manufacturing corporation, alleged that, by reason of defendants' fraudulent misrepresentation as to the value of his interest in the corporation, he was induced to enter into an agreement by which he sold his stock for an inadequate price, resigned as an officer and director, cancelled his contract of employment and gave general releases. (There is no mention of any litigation or assertion of a claim against defendants prior to the transaction in question.) He sued for damages suffered as a result of the fraud. Defendants contended the release was a bar to the action "unless, after rescinding the contract \* \* \* and the releases, he tenders back the consideration he has received." (40 *N. E. 2d,* at *p.* 244). The Court of Appeals reversed a summary judgment for defendants, holding, in reliance on the leading case of *Gould v. Cayuga County Nat. Bank,* 99 *N. Y.* 333, 2 *N. E.* 16 (*Ct. App.* 1885), that plaintiff could sue for damages resulting from the fraud on the theory of affirmance of the transaction.

This remedy is not universally recognized in release cases, particularly when the discharge was given in connection with the settlement of a claim for personal injuries. *Shallenberger v. Motorists Mutual Insurance Co.*, 167 *Ohio St.* 494, 150 *N. E.* 2d 295 (*Sup. Ct.* 1958), which collects the decisions *pro* and *con,* typifies the opposing point of view to the effect that the only remedy available is to set the release aside in equity and then sue on the original claim. As a reason for denying the right to affirm the release and sue for damages, the Ohio court regarded the difficulty of assessing damages in such a suit as of great importance.

Without question, New Jersey recognizes that a defrauded party may affirm a tainted transaction and sue at law in deceit. *Judson* II, *supra* (25 *N. J.* 17). This is so even where the matter involves personal injuries. *Racanati v. Black Diamond Stevedoring Co., Inc.*, 132 *N. J. L.* 250 (*E. & A.* 1944), affirming 130 *N. J. L.* 261 (*Sup. Ct.* 1943). There plaintiff was injured in maritime employment, entitling him to compensation under a federal statute. He claimed that his employer, the defendant, knowingly misrepresented that he had no permanent disability, thereby inducing him not to commence a proceeding for compensation, and that he did not discover the existence of such disability and the fraud until he was barred from legal action by the statutory time limitation. He sued in fraud for damages resulting from the loss of the right of compensation. The court sustained his right to maintain the action, saying that mere difficulty of assessing damages does not bar the remedy, but found there had been no fraud. See also *Hagen v. Gallerano*, 66 *N. J. Super.* 319 (*App. Div.* 1961); *Landriani v. Lake Mohawk Country Club*, 26 *N. J. Super.* 157 (*App. Div.* 1953). *Cf. Williams v. DeFabio*, 3 *N. J. Super.* 182 (*App. Div.* 1949); *Lyster v. Berberich*, 3 *N. J. Super.* 78 (*App. Div.* 1949).

But this State has heretofore denied the remedy where the deceit sought to be sued upon involved fraud in the inducement of the barring release. The question appears to have been passed upon only in *Kearney v. National Grain Yeast*

*Corporation, supra* (126 *N. J. L.* 307). There the plaintiff had originally sued to recover his investment in a corporation. The action was compromised for a lesser sum on representations as to the corporate financial condition and a release given. Later plaintiff found the representations to have been false and he instituted a second suit in deceit. As previously stated, the court held that the release barred renewal of the original claim until it was avoided in equity. The plaintiff's trouble was, however, that action on the original released claim was already barred by the statute of limitations. He therefore urged that his present suit, commenced within six years of the discovery of the fraud, was on the theory of affirmance of the release and simply an action for damages caused by the fraud. The court refused relief on that theory, saying that the "[p]laintiff may not accomplish indirectly what he is forbidden to accomplish directly." (126 *N. J. L.,* at *pp.* 312–313). The thesis was that to hold otherwise would permit a party to have questions of fraud in the consideration for a release under seal determined at law contrary to the common law rule earlier discussed. We think the court's rationale constituted a far too technical application of an already hypertechnical principle and was not necessarily required by that rule. Furthermore, the result reached has no sound place in our present court system in which all issues of whatever nature are determined in one action. We think that the holding of *Kearney* in this respect should, therefore, no longer be followed and that we should permit such actions in line with the New York cases cited.

This brings us to a third view of plaintiff's cause of action, explored at the oral argument and discussed in supplemental briefs. The theory relates to the purpose of the release and whether it has any relevance or effect at all in the present suit. If it has none, the complaint contains a lot of surplusage and the cause of action would not be substantially different from that asserted in *Judson* II, *supra* (25 *N. J.* 17). While all the facts with reference to it have not yet been completely developed, it appears on the present record

that plaintiff's case is also saved from dismissal at this stage on this theory.

It will be recalled that the complaint, for reasons best known to plaintiff's counsel (who did not represent him previously), is keyed to the "settlement" of the prior litigation as the transaction claimed to have been fraudulently induced rather than the stock sale, as plaintiff's deposition makes clear. (We place no significance in plaintiff's deposition testimony, and the corporate defendants' argument based thereon, that the present suit is identical in its charges with the prior action. This is just not so. Lay litigants cannot be bound by their own ideas of legal theory and ordinarily deposition examination along such lines is improper. This instance is indicative of the extent to which the examinaton of plantiff went beyond permissible bounds.) It may be assumed for present purposes, that, despite the allegations of the complaint, the essence of plaintiff's grievance is fraud in the stock sale and not in the disposition of the prior litigation. This is so because plaintiff does not seek to reassert those claims. It is further deducible from the present record that the release, as a matter of actual mutual intent, was designed only to discharge the claims asserted in that earlier suit and any other claims already existing and, along with the dismissal of that action, simply for the purpose of wiping the slate clean of that litigation. Therefore if the instrument had no other purpose or value, it was merely incidental to the stock sale, its only efficacy would be limited to discharge of prior claims, and it would have no relevance in the present suit.

Defendants contend, however, that the instrument, by reason of its generality, must be held, as a matter of law, to discharge as well claims, like the present fraud charge, arising out of the very transaction in which it was given and simultaneously with its delivery.

The scope of a release is determined by the intention of the parties as expressed in the terms of the particular instrument, considered in the light of all the facts and cir-

cumstances. A general release, not restricted by its terms to particular claims or demands, ordinarily covers all claims and demands due at the time of its execution and within the contemplation of the parties. 76 *C. J. S. Release* §§ 51, 52; 45 *Am. Jur. Release* §§ 26–28. *Cf. Daily v. Somberg,* 28 *N. J.* 372 (1958); *Breen v. Peck,* 28 *N. J.* 351 (1958); *Van Slyke v. Van Slyke,* 80 *N. J. L.* 382 (*E. & A.* 1910). Questions of such intent cannot ordinarily be fairly disposed of on affidavits in a summary judgment application. *Breen v. Peck, supra* (28 *N. J.,* at p. 355).

 Claims or demands arising contemporaneously with delivery, however, are not discharged unless expressly embraced therein or falling within the fair import of the terms employed. 76 *C. J. S. Release* § 53. While this principle does not appear to have been precisely passed upon in New Jersey, we see no reason why we should not follow the general view. It may be noted, by way of analogy from the standpoint of policy considerations, that our courts have held "that a party to an agreement cannot, simply by means of a provision in the written instrument, create an absolute defense or prevent the introduction of parol evidence in an action based on fraud in the inducement to contract [citing cases]." *Ocean Cape Hotel Corp. v. Masefield Corp.,* 63 *N. J. Super.* 369, 377–378 (*App. Div.* 1960). Accord, *Dover Shopping Center, Inc. v. Cushman's Sons, Inc.,* 63 *N. J. Super.* 384, 390 (*App. Div.* 1960). The following are examples of cases in other jurisdictions which apply the general rule and hold that a claim or obligation which did not preexist the release was not covered by it. *Miller v. Schloss,* 159 *App. Div.* 704, 144 *N. Y. S.* 996, 1000–1001 (*App. Div.* 1913), reversed on other grounds 218 *N. Y.* 400, 113 *N. E.* 337 (*Ct. App.* 1916); *In re Quick's Will,* 147 *Misc.* 28, 263 *N. Y. S.* 146, 153–154 (*Surr. Ct.* 1932); *Andrews v. Brewster,* 124 *N. Y.* 433, 26 *N. E.* 1024 (*Ct. App.* 1891); *Hill v. Whidden,* 158 *Mass.* 267, 33 *N. E.* 526 (*Sup. Jud. Ct.* 1893); *Clark v. Clark,* 197 *Iowa* 257, 196 *N. W.* 1011, 1013 (*Sup. Ct.* 1924). Specifically, in *Goldsmith v. National Container*

*Corporation, supra* (40 *N. E.* 2d 242), the court held that the releases delivered at the time of the stock sale transaction did not bar a claim for deceit in the inducement for that transaction.

A fraud claim arising out of the transaction in which the release in the instant case was given is certainly not expressly embraced in that instrument, nor can it be said on the present record that it was within the fair import of the general terms employed. Such a contention cannot be sustained by anything short of proof that the matter of possible fraud in the stock sale was specifically considered at the time the transaction was consummated and the release delivered. That heavy burden rests squarely upon the defendant. *Daily v. Somberg, supra* (28 *N. J.*, at *p.* 385).

Defendants have also advanced certain other legal bases on which, they contend, the dismissal of the suit may be sustained. None of them is meritorious and only one warrants comment. It is suggested that plaintiff is barred from questioning the stock sale because he did not himself examine the corporate books before entering into the transaction. Apart from the fact that the proofs to date indicate the misrepresentations complained of would not have been detected by inspection of the records, the law is settled in this State that fraudulent misconduct is not excused by the credulity or negligence of the victim or by the fact that he might have discovered the fraud by making his own prior investigation. *Dunston Lithograph Co. v. Borgo,* 84 *N. J. L.* 623, 625 (*E. & A.* 1913); *Bleyer v. Veeder,* 119 *N. J. Eq.* 398, 407 (*Ch.* 1936). See 5 *Williston, Contracts* § 1516 at *p.* 4234 (*rev. ed.* 1937).

The discussion to this point has established the sufficiency of the cause of action as matter of law under various views of the complaint in the light of plaintiff's deposition. The question remains whether summary judgment was properly granted because it was shown palpably that a *prima facie* case in deceit had not been demonstrated factually. The trial judge intimated that defendants had not

maintained their burden in this respect, certainly at this stage of discovery, and we agree. Plaintiff's testimony was clearly competent to raise an issue of material fact that representations had been made to him and that he relied thereon. The evidence concerning the falsity thereof was not within his personal knowledge and entirely hearsay. The other requisite elements—that the representations were knowingly made to deceive and with the intent that they be relied upon—are ordinarily matters which must be inferred from circumstances and a conclusion adverse to a plaintiff will generally be very difficult to sustain from papers alone. *Judson* I, *supra* (17 *N. J.* at *p.* 76).

Competent proofs as to falsity of the misrepresentations will undoubtedly have to be sought from the corporate books and records and the testimony of defendants themselves and third parties—certainly not available to plaintiff when he had not yet had sufficient opportunity for discovery. While summary judgment could be awarded if, after full discovery, plaintiff could make out no possible inference of falsity, plaintiff's motion to stay the application until the completion of his discovery certainly should have been granted, *R. R.* 4:58–7 (as we are sure it would have been had not the trial judge felt himself compelled to dismiss the action for reasons of law). The matter should now take this course.

One additional matter should be mentioned for guidance in future phases of the case. Plaintiff contends that, even if he cannot satisfy the trier of fact that Busacco made the misrepresentations in the telephone conversation as stated in his deposition testimony, he still has made out a case on the theory of failure to disclose fully the true financial picture when there was an affirmative duty so to do. He urges the duty existed by reason of two fiduciary relationships, the first arising between stockholders and corporate officers and directors, and the second, by virtue of the family connection with his brother-in-law. We think the question cannot be decided abstractly and without a full record. Whether the personal connection here was such as to amount to a confidential

relationship sufficient to impose a duty of disclosure obviously depends on detailed facts. And with reference to a duty in the corporate scheme, we pointed out in *Judson* II, *supra* (25 *N. J.*, at *p.* 28), that existing decisions in this state have taken "a narrow and much criticised view \* \* \* with respect to the duty of disclosure of an officer and director who purchases shares from a stockholder." If the present view that such a duty ordinarily does not exist is to be reconsidered, this should only be done in a fully developed factual setting and after thorough presentation of the legal question, neither of which exists at this stage of the case.

The judgment is reversed and the cause remanded for further proceedings consistent with this opinion. Costs to abide the ultimate outcome of the case.

*For reversal*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For affirmance*—None.